FILED

02/28/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 13, 2016

**STATE OF TENNESSEE v. DEMARKUS MONTREAL TAYLOR**

**Appeal from the Circuit Court for Montgomery County
No. CC15-CR-189          William R. Goodman, III, Judge**

**No. M2016-00255-CCA-R3-CD**

The Defendant, DeMarkus Montreal Taylor, appeals as of right from his conviction of first degree murder in the perpetration of or attempt to perpetrate aggravated child abuse, two counts aggravated child abuse, and one count of filing a false report. See Tenn. Code Ann. §§ 39-13-202(a)(2); -15-402; -16-502. On appeal, the Defendant contends (1) that the evidence was insufficient to sustain his conviction, arguing that the evidence presented to the jury was predominately circumstantial and that there was no direct proof that the Defendant committed the offenses for which he was charged; (2) that the trial court abused its discretion when it admitted autopsy photographs of the victim, specifically photographs of the victim's brain and eyes; (3) that the trial court erred when it denied the Defendant's motion for a new trial after counsel for the co-defendant attempted to introduce testimony regarding the Defendant's prior drug sales; and (4) that the trial court erred in admitting the victim's autopsy report, which contained un-redacted information regarding prior physical abuse. Following our review, we affirm the Defendant's convictions for first degree felony murder, aggravated child abuse, and false reporting.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Chase T. Smith, Clarksville, Tennessee, for the Defendant, DeMarkus Montreal Taylor.

Herbert H. Slatery III, Attorney General and Reporter; Matthew Todd Ridley, Assistant Attorney General; John W. Carney, District Attorney General; Kimberly S. Lund and Daniel Stephenson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case arises after emergency personnel responded to a call at the residence of the Defendant and his co-defendant, Rawny Taylor.[1] The call was made at approximately 2:56 p.m. on July 12, 2013 and regarded a four-year-old child who was not breathing. Christopher Shoemaker, a volunteer firefighter arrived on the scene first. The Defendant met Mr. Shoemaker as he arrived at the trailer and led him inside. Upon entering the trailer, Mr. Shoemaker walked to a back bedroom and observed the Defendant's four-year-old daughter, A.T.,[2] lying on a bed, covered by a blanket up to her chin. Mr. Shoemaker checked the victim for a pulse, but he did not find one. Additionally, it appeared that rigor mortis had set in because the victim "was stiff and cold[,]" according to Mr. Shoemaker. He observed that there was a "small amount of blood in her nostril and on the edge of her lip." After making these observations, Mr. Shoemaker did not believe that lifesaving measures would be able to help the victim, and he informed the Defendant "that there was nothing [he] could do."

Mr. Jerry Buchanan, who worked for Woodlawn Volunteer Fire Service and Clarksville Fire and Rescue, explained that he was a medical first responder and that he arrived at the trailer following Mr. Shoemaker. In the trailer's back bedroom, he observed that the victim had blood on her right nostril and lip. After Mr. Shoemaker informed him that the victim "was cold to the touch and rigors had set in[,]" Mr. Buchanan cleared the residence and did not allow anyone else inside.

Mr. Danny Cotterell also responded to the emergency call. He testified that he was employed as a shift lieutenant with Montgomery County Emergency Medical Services, and his duties included being responsible for daily supervision of his shift, responding to critical calls, and acting as a Deputy Coroner for the County Medical Examiner. As a Deputy Coroner, he completed the initial coroner's report and sent it to the County Medical Examiner.

Upon entering the bedroom, Mr. Cotterell "pulled the blankets back a little and reached down and touched [the victim]." He observed that the victim "had rigor mortis[,]" which meant that "there [was] nothing [they] could do any longer to attempt to resuscitate." He explained that he saw "some blood coming from her nose and blood on

---

[1] The Defendant and Rawny Taylor were tried jointly.

[2] It is the policy of this court to protect the identity of minor victims and witnesses. Therefore, we will use initials for each minor involved in this case.

her lips[.]" He further examined the body for the purposes of the coroner's report and found "bruising on the right side of [the victim's] face[,]" "bruising on her chin[,]" and "bruising on both arms." He also observed a "wound or bruise on her chest." When Mr. Cotterell touched the victim's head, he felt "a depressed area of the skull behind her right ear . . . [t]oward the back of her head."

Mr. Cotterell left the bedroom and spoke to Ms. Taylor, the co-defendant and the victim's mother, regarding the victim's medical history. Ms. Taylor told him that she had checked on the victim the night before. She heard the victim's snoring but believed that she was sleeping well and left her alone. The Defendant told Mr. Cotterell that he put the victim to bed early the night before because she had been misbehaving. The Defendant said that sometime later the victim came out of her room and told the Defendant that her head was hurting. The Defendant felt her head but claimed he did not feel any bumps, so he sent her back to bed.

Deputy Shanna Grice was a patrol officer with the Montgomery County Sheriff's Office and testified that she was working on July 12, 2013, and responded to the call regarding a four-year-old, non-responsive child at the Defendant's residence. Upon looking into the bedroom, she observed the victim lying "in a position that was not very natural and [she] noticed . . . bruising on [the victim's] left arm." Deputy Grice went back outside and secured the residence. She asked both parents and the two other children to remain in the front right bedroom of the trailer away from the victim's room. During this time, the Defendant did not appear to be very emotional and Ms. Taylor cried and "was . . . very upset."

Mr. Michael Allen Mason testified that he was neighbors with the Defendant and his family. He lived in a mobile home on a nearby lot and was able to see the Taylor's home from his own. Mr. Mason explained that he had known the Defendant and Ms. Taylor for about ten years. He testified that, at approximately 9:30 or 10:00 a.m., on the morning of July 12, 2013, he returned home from work to retrieve something he had forgotten. From Mr. Mason's home, he observed the Defendant and Ms. Taylor sitting outside on the back steps of their trailer and claimed that "it seemed as though one were consoling the other."

On cross-examination, Mr. Mason was asked by the co-defendant's counsel if he had "personal knowledge that [the Defendant] ha[d] sold marijuana in the past?" Counsel for the State objected to the relevance of the question, and the Defendant's counsel objected and requested a mistrial arguing that the question was overly prejudicial and that it could not be cured by a curative instruction. The objection was sustained. However, the court denied the request for a mistrial but instructed the jury to disregard the question.

Investigator Jeff Morlock worked with the Criminal Investigations Section of the Montgomery County Sheriff's office and testified that he was involved with the investigation of this case. Investigator Morlock assisted in interviewing the Defendant at the scene, took photographs of the scene, and searched inside of the residence. The Defendant voluntarily made a statement to Investigator Morlock. The Defendant wrote out his statement and signed it, which Investigator Morlock identified and read into the record:

> Yesterday, my kids had started acting up, doing nasty things with each other. Then I had to split them up by putting [the victim] in her bed and my son on the couch with time out. After I walked out of the room, [the victim] had come out and told me that she had hit her head. So I felt her head for knots and there wasn't any. I told her to lay down and you will be okay. After that, we made some dinner for the kids. [The victim] would not wake up but she was breathing and snoring. We just figured that she was tired, so by 11:30 or 12:00 we had made all the kids go to bed and [Ms. Taylor] and myself went into the room to give them all a kiss and [the victim] was snoring and breathing good. So we checked on her again before we went to sleep and she was doing the same thing so we just figured she was tired. My wife woke up the next . . . afternoon and checked on her and then she run back in the room with me and she said she was cold and not breathing. I jumped out of the bed, ran into the room and shook her a little bit to try and wake her up. She didn't get up and then I called.

Also, Investigator Morlock identified photographs he had taken of the Taylor residence.

Investigator Joshua Wall testified that he was an investigator with the Montgomery County Sheriff's Office. Mr. Wall stated that on July 12, 2013, he responded to the Taylor residence at approximately 4:30 p.m. His duties included searching the area and taking photographs of the scene. Mr. Wall identified photographs that he took of the inside and outside of the trailer. He observed that the bedroom in which the victim was located had three beds, two of which were unoccupied, and one on which the victim was lying. While in the room, he took photographs of the victim on the bed. He identified multiple photographs he had taken of the victim, and they were entered into evidence.

Investigator Mark Wojnarek testified that he was a criminal investigator with the Montgomery County Sheriff's Office and that he responded to the scene at the Taylor residence on July 12, 2013. He was working as a supervisor, and his duties included directing personnel and crime scene technicians, assigning a lead investigator, and watching the body. Later in the investigation, Investigator Wojnarek conducted an

interview with the Defendant at the jail. Investigator Wojnarek identified a partial recording of the jail interview, and the recording was entered into evidence.[3]

Mr. Norman Ray Clark, III, a custodian of records with Sprint, testified to verify Ms. Taylor's telephone records. Mr. Clark identified a copy of a record maintained by Sprint for the telephone number 931-302-3179. The account holder for this telephone number was Ms. Taylor. The record showed incoming and outgoing calls "and text messages with the appropriate date and time as well as the numbers that [were] in communication with one another." Based on his review of the Sprint document, there were three incoming calls in the morning on Ms. Taylor's telephone before the telephone was used to call 911. The first and third calls were unanswered, but according to the length of the second incoming call, it was answered.

Investigator Julie Webb was a criminal investigator employed with the Montgomery County Sheriff's Office and helped investigate this case. On July 12, 2013, she responded to the call at the Defendant's residence, and spoke with Ms. Taylor. Regarding the day before, Ms. Taylor informed Investigator Webb that she had left the residence for work at 9:30 a.m. The Defendant and their three children, M.T., A.T., and D.T., were still asleep. She returned home from work at 7:30 p.m. and stated that the victim was in bed at that time. She tried to wake the victim for supper, but she would not wake up and was snoring loudly. Ms. Taylor acknowledged that it was unusual for the victim "to snore like that, that loudly." After dinner, D.T. "went to sleep on the couch[,]" and M.T. "went into her bedroom . . . and [Ms. Taylor] started a movie for her." When the children were in bed, "she and her husband took a shower together, they put on lotion." Around midnight, Ms. Taylor checked on the victim again and "she was still snoring loudly, she had never woken up[,]" and Ms. Taylor "kissed her" and then "went to sleep herself." Ms. Taylor told Investigator Webb that she and her husband woke up late on July 12, 2013. Two of their children had come in for breakfast, but the victim had not joined them. Ms. Taylor went to check on the victim and found her cold and non-responsive. Ms. Taylor ran down the hall and screamed for her husband. Ms. Taylor put her statement in writing. Investigator Webb identified it, and it was entered into evidence.

On July 12, 2013, Investigator Webb also entered the Defendant's residence and went into the room in which the victim was found. She observed "a very small little girl laying on top of the bed and she was deceased." The victim had "bruising on her left arm[,]" "discoloration on her face[,]" "blood around her nostrils, and her mouth had what appeared to be like teeth marks and it . . . had blood on it."

---

[3] We note that a supplemental record was submitted for this case; however, the record does not contain the recordings of the Defendant's 911 call or the Defendant's interview with investigators at the jail.

Investigator Webb also spoke with Ms. Taylor on August 6, 2013. On that date, Ms. Taylor admitted that she and the Defendant had not been truthful about the time of day that they discovered the victim. They found the victim on the morning of July 12, 2013, and Ms. Taylor was afraid to call the 911 and decided not to call at that time. In this interview, Ms. Taylor also admitted that she and the Defendant waited five hours before calling 911.

M.T., the victim's older sister who was eight years old at the time of trial, testified about the events surrounding the victim's death. M.T. testified that her "birth parents" killed the victim. She claimed that from her bedroom, she saw "them hurting [the victim] in the bathroom." When asked how the victim was being hurt, she responded, "By getting beatings." M.T. claimed that the Defendant beat the victim "[w]ith his hands sometimes" and "sometimes a belt." Her mother was at work when this happened. M.T. stated that she shared a room with the victim and their brother. After seeing the victim in the bathroom, M.T. saw the victim return to their bedroom and get in bed. When their mother returned home from work that evening, the victim was still in bed. She explained that the last time she saw the victim, the victim was in bed and she "was all blue and her teeth were blue and stuff." When M.T. saw that the victim was blue, she attempted to wake her, but the victim did not respond. When she could not wake the victim, she told her parents. Her parents went in the bedroom to check on the victim, and M.T. and her brother sat on a couch in another room. M.T. explained that her parents did not call for help right away.

Dr. Adele Lewis was a forensic pathologist at the Medical Examiner's Office in Davidson County and offered expert testimony regarding the autopsy she performed on the victim on July 13, 2013. The victim's date of death was July 12, 2013, and Dr. Lewis made the following observations regarding the victim's head: The victim had a bruise on her right ear, a "black bruise on her right cheek[,]" and a "brownish yellow bruise on her left cheek." There were "two black bruises with some scrapes on top of those" on the left side of the victim's jaw, and there was a scrape on the underside of her chin. She also observed that the "left side of her neck had several pinpoint hemorrhages about two by two inches in total area."

Dr. Lewis also discussed her findings regarding the inside of the victim's head. First, she removed the skull and examined the brain. She found "some bruises and some scalp bruises on both sides of the top of the victim's head." There was a "deep scalp bruise on the back of her head." The victim had a "subdural hemorrhage[,]" which meant that she had bleeding under the covering of the brain. There was also bleeding on the right side of the brain. Dr. Lewis further observed "bruising and bleeding inside the back of [the victim's] neck where [the] spinal cord connected to [the] head and there was bleeding on top of the spinal cord itself." Dr. Lewis explained that there should be no

-6-

blood on the brain. The brain should be a "pink/tan color" without any bleeding. The victim's brain "was red and bloody and had blood clots on it."

When asked what sort of injury could have caused this, she responded that this is the sort of injury suffered after a child was shaken. Also, in the victim's case, there was evidence that her head hit an object or an object hit her head. She explained that this was how deep scalp bruises occurred and how the victim likely obtained the bruises on her face. Dr. Lewis claimed that a four-year-old would not have the necessary strength to inflict such injuries herself. Regarding the types of injuries the victim had, Dr. Lewis "would expect to see in someone who ha[d] been in a major car crash or who had fallen two or three stories out of a building."

Dr. Lewis testified that she observed more injuries to the victim's head. She explained that when the brain is injured it begins to swell, and when the brain swells, it cuts off blood supply to the brain. She observed that the victim "had a very swollen brain." She also noted that the victim "had bleeding in the nerves that connect [the] eyeballs to [the] brain and also bleeding inside the backs of her eyes." She stated that bleeding inside the eyes was "indicative of child abuse." Also, Dr. Lewis testified that the type of injury necessary to cause the victim's spinal cord injury required "a very violent amount of force." It was caused by a "whiplash type injury" or "being struck in the back of the head."

In addition to observing the victim's injuries, Dr. Lewis also noted that the victim had a shunt in her head. She explained that "a shunt is just some tubing that a neurosurgeon can insert in order to drain a fluid collection either in the brain or on the brain." She stated that the shunt in the victim's head was working because it had drained blood from her brain down into her abdomen.

Dr. Lewis also found injuries to the victim's abdomen. She observed that

on the upper part of [the victim's] chest, she had two yellow brown bruises, one of about a quarter of an inch in diameter and one [was] about three-quarters inch in diameter. The upper part of her abdomen had a one quarter inch in diameter bruise and scrape. The right side of her abdomen had another one quarter inch in diameter purple scrape and bruise. The left side of her abdomen had a two inch complex or group of brown bruises that were about one quarter inch in diameter each. The left side of the lower part of her abdomen or stomach had two brown bruises between three-quarters inch and one and one half inches each. There was some bleeding into the fat underneath the skin associated with that, that was near her left hip.

Dr. Lewis described the following injures she found on the back side of the victim's torso:

> on the right side of the upper part of her back, near the right shoulder, there were two blue bruises of a quarter inch to one half inch in diameter. The right side of the middle of her back had a scrape and a bruise that also had some hemorrhage into the fat underneath the skin. The right buttocks, on her butt cheek basically, had an area that was about three inches in overall dimension. It was linear or line-like, a raise of pinpoint hemorrhages with a clear area in between those areas of pinpoint hemorrhage.
>
> . . .
>
> [O]n the right buttock, there were two brown contusions or bruises and two yellow brown bruises which means that they were at least forty-eight hours old. On the left buttock, there were again two yellow-brown bruises and also, on the left buttock, there was a one and one half inch in length sort of semi-circular purple bruise and that also had bleeding into the fatty tissues underneath the skin.

Dr. Lewis explained that the types of bruises she found on the victim were not likely obtained during normal, everyday activity. Additionally, Dr. Lewis found that "[t]here was a broken rib, the back of the right ninth rib, sort of in the middle of the back, had a healing fracture but also had a fresh or acute fracture through that healing portion of the rib." She explained that such rib fractures were "particularly suspicious for inflicted injury." Following this testimony, Dr. Lewis identified and described multiple photographs taken of the victim during the autopsy, including photographs of the victim's brain and eyes. They were entered into evidence without objection.

Dr. Lewis testified about the victim's snoring prior to her death. She explained "that kind of snoring, that kind of loud kind of breathing and gasping and pauses between breaths [was] called agonal breathing and that means, it's the way someone breathes right before they die." She stated, "it would [have been] clear that something was very wrong with the [victim]." Agonal breathing does not produce the same sound that snoring produces, and she claimed that it could not "easily be mistaken for snoring." She also testified that when a person is having this type of breathing, "some fluids build[] up in the lungs and especially when a person has a head injury, there are also chemicals that get released in the body and that also creates fluid on the lungs." Additionally, agonal breathing is "coupled with a state of unconsciousness."

Overall, Dr. Lewis testified that she suspected the injuries the victim suffered were the result of child abuse. She determined that "multiple blunt force injuries" caused the

-8-

victim's death, and the manner of death was homicide. The circumstances surrounding her death indicated battered child syndrome. She claimed that it was possible the victim may have survived if she had received medical treatment. She determined that there was "no medical or natural causes for [the victim's] injuries." Dr. Lewis based her findings on the multiple injuries of different ages on the victim and the victim's medical history.

The Defendant testified in his own defense. On July 11 and 12, 2013, he was at his residence with his wife and three children. Ms. Taylor was working on July 11, 2013, and he remained at home with the children. He got up around 10:30 a.m. and fed his children breakfast. After breakfast, he took them to their shared bedroom and turned on a movie for them. Throughout the day, he checked on the children and changed out their movies. At some point, his daughter M.T. came and told him that the victim and her brother, D.T., were misbehaving. The Defendant claimed that he separated the victim and D.T. by putting the victim on her brother's bed and D.T. on a couch in another room. Shortly after that, the Defendant was back in his bedroom watching television when the victim came into his room crying and told him that she hit her head. The victim held her hand over the right side of her head. The Defendant checked the victim's head "to see if there were any knots[,]" but he did not feel anything. The Defendant sent the victim back to bed "around 5:30 or 6:00 p.m." He said that Ms. Taylor came home at 7:00 or 7:30 p.m. and made dinner, but the victim was "still asleep in her brother's bed." The Defendant claimed that he walked in her room and looked at her. He heard her snoring and believed she was sleeping.

After dinner, the Defendant explained that he returned to his room to watch television, while Ms. Taylor looked after the children. At some point that evening, he took a shower and checked on the victim again because the bathroom was close to her room. He stated that "she was breathing normal and snoring." Also, the Defendant said that he informed Ms. Taylor that the victim had hit her head. Ms. Taylor and the Defendant put the other children to bed around 10:00 p.m. M.T. slept in her bed in the room with the victim, and D.T. slept in another room on the couch because the victim was in his bed. He claimed that Ms. Taylor checked on the victim again at midnight that night and nothing appeared to be wrong. He woke up the next morning at 11:00 a.m. to Ms. Taylor's "crying and screaming, saying [the victim] was cold in the bed and stiff." He went into the victim's room and confirmed that she was cold and nonresponsive. The Defendant admitted that he did not call 911 right away "because [he] was just . . . a nervous wreck and [he] didn't know what to do and [he] didn't want [his] other two kids to get taken away from [him]." He claimed that he made no calls before calling 911 and denied instructing Ms. Taylor not to call 911. Ultimately, the Defendant called 911 at 2:56 p.m. The Defendant admitted that he lied to police about the time he found the victim and said that he "tried to make it like [he] called right after [he] found her." He

explained that he "just wasn't thinking clearly." Finally, he denied inflicting the injuries on the victim that caused her death.

On cross-examination, the Defendant admitted that he knew the victim was dead when he found her and that he waited five hours before using Ms. Taylor's phone to call 911. The Defendant again denied beating his daughter and claimed that he "didn't see anybody to do it." He confirmed that he was alone with the children all day while their mother was at work and that no one else came into the home. He also testified that Ms. Taylor never hit the children.

Ms. Joyce Blount testified on behalf of Ms. Taylor. Ms. Blount knew Ms. Taylor because they worked together. She confirmed that she and Ms. Taylor worked together on July 11, 2013, and that they both left work at 7:00 p.m.

Ms. Taylor testified in her own defense. She stated that on July 11, 2013, she left for work in the morning while her husband and children were still sleeping. After working all day, she returned home at approximately 7:30 p.m. She explained that when she got home, the victim was in D.T.'s bed, D.T. was on the couch, and M.T. was in the kitchen. The Defendant told her that he had to separate the victim and D.T. because they had been misbehaving. He told her the reason he put her in D.T.'s bed was so that he could see her. Ms. Taylor explained that D.T.'s bed "was the only bed [they] could see from the other room of the house." Before checking on the victim, she began to make dinner for the family. When dinner was ready, Ms. Taylor called the children to come to dinner, but the victim did not wake up. She stated that the Defendant told her the victim had eaten and played and that "she was probably just tired." After walking to the doorway of the children's bedroom, Ms. Taylor heard the victim's "snoring" and believed she was asleep. She did not notice anything wrong with the victim nor did she attempt to physically wake her. After dinner, D.T. returned to the couch and M.T. went into the children's room to watch a movie. Ms. Taylor took a shower and watched a movie in her own bedroom. After the movie was over around midnight, she checked on the victim again, and Ms. Taylor said that the victim "was still snoring and [M.T.] was watching a movie." She explained that the victim snored occasionally, but she was not "an every night snorer." Ms. Taylor kissed the victim and did not notice any markings on her face. After checking on the victim, she went to bed in her own room.

Ms. Taylor testified that she woke up the next morning around 9:00 a.m. and began to get ready for work. From the bathroom, she looked in the children's bedroom and noticed that the victim "was in the same position she was in when [she] checked on her the night before." Ms. Taylor touched the victim on the arm and discovered that she was cold. She ran back into her bedroom and woke up the Defendant and asked him to check on the victim. Ms. Taylor returned to the room with the Defendant, and she

-10-

observed that the victim had "a spot of blood on her nose" and that she was covered with a blanket. When she and the Defendant attempted to wake the victim, they realized that she was "gone" because "[s]he was cold and she was stiff."

Ms. Taylor claimed that she told the Defendant they needed to call the police, but he "called her phone to find her phone, collected her phone" and said that they could not call "the police right now because there were things he had to hide." She said that she knew the victim was dead, but the Defendant took her phone and told her not to call the police. Eventually, the Defendant called the police. Ms. Taylor admitted that when Investigator Webb interviewed her that day, she lied about the time she got up. She testified that the Defendant told her that she "was going to tell [the police] that [they] just woke up and [they] just found [the victim] and [they] were calling the police." She stated that the first time she told Investigator Webb the truth was during an interview on August 6, 2013.

Ms. Taylor reiterated that on July 11, 2013, she did not see any injuries on the victim's face. She said that the victim "was asleep in the bed" and she "had no reason to search her or strip her down." After the victim's death, Ms. Taylor testified that the following conversation occurred between her and the Defendant:

I was downstairs by the pool table, crying and he came downstairs and was pacing back and forth and he was like you gotta quit all that crying. And I was like, I don't know about you, but I just lost a child, I can't help it. He said I just hope this didn't happen when I threw her on the bed and she hit her head[.] I sat up, I said what do you mean when you threw her on the bed and she hit her head? And he said I mean when she threw herself in the bed and she hit her head, like I told you she did[.]

Ms. Taylor stated that she told Investigator Webb about the Defendant's comment.

On cross-examination, she insisted that she never observed any bruises on the victim's body when she came home from work on July 11, 2013. She stated that if she had known her "child needed any help or there was anything [she] could do, [she] would have got[ten] her help." She insisted that the reason she did not immediately call the police the next day was because she was afraid of the Defendant. She claimed that "as much as [she did not] want it to be so, [she knew] there [was] nothing [she could] do for [the victim] or anybody else at that time[,]" and she had to protect herself and her other two children from the Defendant. She insisted that she "didn't feel like there was anything that [she could] do, that wasn't going to do anything but hurt [her], [M.T.] and [D.T.]"

-11-

The jury convicted the Defendant of two counts of aggravated child abuse, two counts of felony murder, and one count of false reporting. The Defendant received an effective life sentence to be served with the Tennessee Department of Correction. The Defendant filed a timely notice of appeal.

## ANALYSIS

### I. Sufficiency

On appeal, the Defendant challenges the sufficiency of the convicting evidence. He argues that "the evidence submitted to the jury was predominately circumstantial and there was no direct proof that the [D]efendant inflicted the injuries that [the victim] sustained on the day in question." The State responds that there was sufficient evidence to sustain the Defendant's convictions. We agree with the State.

An appellate court's standard of review when the Defendant questions the sufficiency of the evidence on appeal is "whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id., State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

"Direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

-12-

As relevant here, first degree felony murder is defined as, "A killing of another committed in the perpetration of or attempt to perpetrate . . . aggravated child abuse . . . ." See Tenn. Code Ann. § 39-13-202(a)(2). Additionally, "[n]o culpable mental state is required for conviction under subdivision (a)(2) or (a)(3), except the intent to commit the enumerated offenses or acts in those subdivisions." Id. A person commits the offense of aggravated child abuse, who commits child abuse, and the act of abuse results in serious bodily injury. See Tenn. Code Ann. § 39-15-402. Child abuse is defined as "knowingly, other than by accidental means, treat[ing] a child under eighteen (18) years of age in such as manner as to inflict injury[.]" Tenn. Code Ann. § 39-15-401(a).

An individual makes a false report when they "[i]nitiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that . . . [t]he information relating to the offense reported is false." See Tenn. Code Ann. § 39-16-502.

Here, there is sufficient proof to support the Defendant's convictions. Multiple emergency responders testified regarding the state in which the victim was found. She had blood on her nose and lip, and there were bruises on her body. The medical examiner testified about the extensive injuries that led to the victim's death, and her expert opinion was that the victim suffered from battered child syndrome and her death was a homicide. The Defendant was alone with the victim on the day of her death. Further, his daughter M.T. testified that she saw the Defendant "beat" the victim. The Defendant waited five hours after finding the victim before calling the police and then lied about when he found her. Ms. Taylor testified that the Defendant commented that he hoped "this didn't happen when [he] threw her on the bed and she hit her head[.]" Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for murder in the first degree in the perpetration of or attempt to perpetrate aggravated child abuse, aggravated child abuse, and false reporting.

## II. Admissibility of Photographs

The Defendant contends that the trial court improperly admitted autopsy photographs depicting the victim's brain and eyeballs. The Defendant argues that the photographs were "overly graphic and [a] needless presentation of cumulative evidence." Also, the Defendant argues that these photographs were admitted to "exacerbate" the emotions of the jury and that they did not "depict the injuries" that the victim suffered. The State responds that the Defendant has waived any complaints regarding the admission of these photographs because he failed to object to their admission when they were introduced into evidence at trial. We agree with the State.

-13-

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. See State v. Banks, 594 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; Banks, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Id. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. Id. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. Id. at 949; see also State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

At trial, the State introduced the autopsy photographs of the victim's brain and eyes during the testimony of Dr. Lewis. The Defendant made no contemporaneous objection at trial, raising the issue for the first time on appeal. See Tenn. Crim. App. 36(a) ("Nothing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection). Thus, the issue is waived for failure to make a contemporaneous objection at trial.

Additionally, the Defendant is not entitled to plain error relief because review of the issue is not necessary to do substantial justice as any error would be deemed harmless. See State v. Adams, 405 S.W.3d 641, 656-68 (Tenn. 2013). The doctrine of plain error only applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused must not have waived the issue for tactical reasons; and

(e) consideration of the error must be "necessary to do substantial justice.

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be]

especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Plain error is not appropriate here because the Defendant has failed to establish that consideration of the error is necessary to do substantial justice. The autopsy photographs entered as evidence were not so gruesome or overly graphic that their probative value was substantially outweighed by the danger of unfair prejudice. Even if the autopsy photographs were found to be unfairly prejudicial, the error would be harmless because there is no indication that the photographs affected the outcome of the trial. Accordingly, we conclude that plain error review is not warranted and that this issue is without merit.

*III. Denial of Mistrial*

The Defendant contends that the trial court erred in denying his motion for a mistrial after counsel for his co-defendant asked a witness "if he had any personal knowledge that [the Defendant] sold marijuana in the past." He argues that the Defendant "was already in a poor light due to the subject matter" and that "the curative instruction is not enough to eliminate the damage caused by the question." The State responds that the trial court properly exercised its discretion when it denied the Defendant's motion for a mistrial. We agree with the State.

The decision whether to grant a mistrial is an issue entrusted to the trial court's sound discretion. See State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Gilley, 297 S.W.3d 739, 764 (Tenn. Crim. App. 2008) (quoting State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). Accordingly, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. Banks, 271 S.W.3d 90, 137 (Tenn. 2008) (citing State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004)). The burden of establishing the necessity of mistrial lies with the party seeking it. Id. (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict. Id. On appeal, this court will disturb a trial court's denial of a motion for mistrial only when there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); Williams, 929 S.W.2d at 388 (Tenn. Crim. App. 1996). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W. 3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)); see also State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999).

In his brief, the Defendant mentions Tennessee Rule of Evidence 609, which addresses witness impeachment by evidence of a conviction of a crime. However, this rule of evidence is not relevant here. At trial, counsel for the co-defendant asked a witness if he "had any personal knowledge that [the Defendant] ha[d] sold marijuana in the past." Before the witness could respond, both counsel for the Defendant and the State objected to this question. The court did not allow the witness to answer and instructed the jury to disregard the question. There was no mention of a prior conviction; rather, such a question raises the issue of a prior bad act. Tennessee Rule of Evidence 404(b) is the appropriate rule to apply to this issue. The rule states, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Thus, the Defendant waives the issue for inadequately raising a relevant argument in his brief. Once again, plain error analysis is not necessary. The witness never responded to the question, and the trial court adequately addressed the improper question by issuing a curative instruction. Thus, the Defendant is not entitled to plain error relief because review of this issue is not necessary to do substantial justice.

### IV. Admissibility of Autopsy Report

The Defendant contends that the trial court erred in allowing the State to introduce the victim's autopsy report, which contained un-redacted language regarding a prior incident of physical abuse. The Defendant argues that "such information amounted to propensity type proof or proof of a prior bad act" and that this violates Tennessee Rule of Evidence 404(b); though, he concedes that the autopsy report does not specifically state that the Defendant committed the abuse. The State responds that the Defendant has waived his challenge to the admission of the victim's autopsy report because he failed to object to the introduction of the report at trial and he made no request that the "allegedly offensive portion be redacted." We agree with the State.

First, the Defendant failed to raise an objection to the introduction of the of the autopsy report at trial. Thus, he has waived appellate review. Additionally, plain error review is not necessary for this issue. The Defendant concedes that the autopsy report did not identify the Defendant as the individual who inflicted previous abuse on the victim. Thus, the Defendant is not entitled to plain error review because review of this issue is not necessary to do substantial justice.

### CONCLUSION

Based upon consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____

D. KELLY THOMAS, JR., JUDGE